IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DIVISION OF NEW YORK

| | |
|---|---|
| IN RE: SUBPOENA TO SAM KREVLIN | MISC. CASE NO: 25-mc-00376-MMG |
| Non-Party Movant. | |

| | |
|---|---|
| KENNETH NIXON, | CASE NO: 23-cv-11547 |
| Plaintiff, | HON. SUSAN K. DECLERCQ |
| v. | |
| DETECTIVE MOISES JIMENEZ, COMMANDER JAMES TOLBERT, DETECTIVE KURTISS STAPLES, SGT. EDDIE CROXTON, OFFICER ALMA HUGHES-GRUBBS, AND OTHER AS-OF-YET UNKNOWN EMPLOYESS OF THE CITY OF DETROIT, | |
| Defendants. | |

**DEFENDANTS' BRIEF IN OPPOSITION TO NON-PARTY SAM KREVLIN'S MOTION TO QUASH**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii
INTRODUCTION ..................................................................................................................... 1
BACKGROUND ....................................................................................................................... 1
ARGUMENT ............................................................................................................................. 6
I. Krevlin Failed to Demonstrate Entitlement to Absolute Protection Under New York Shield Law or Federal Qualified Reporters' Privilege. ........................................................ 6
   A. Krevlin Failed to Meet His Burden to Establish Facts that are the Essential Elements of a Claim of Privilege. ....................................................................................... 8
   B. The Information and Materials Sought From Krevlin Are Relevant to a Significant Issue in the Case and Cannot be Obtained from Other Sources. ................................................. 9
II. Krevlin Waived Any Privilege Under Federal Qualified Reporters Privilege and New York Reporters Shield Law by Disclosing the Proclaimed Protected Information to a Non-Protected Third-Party and Failing to Provide a Privilege Log. ................................................. 11
III.  Krevlin Is Not Entitled to Attorneys' Fees ........................................................................ 13
CONCLUSION ........................................................................................................................ 15

# **TABLE OF AUTHORITIES**

**Cases**

*Blum v. Schlegal*, 150 F.R.D 42 (W.D.N.Y., 1993) .................................................................... 8
*Breaking Media, Inc. v. Jowers*, 2021 WL 1299108 (S.D.N.Y., April 7, 2021) ......................... 15
*Gonzales v. National Broadcasting Co., Inc.*, 194 F.3d 29 (2nd Cir. 1999) ............................ 9, 10
*In re Air Crash at Belle Harbor, New York on November 12, 2001*, 241 F.R.D. 202 (S.D.N.Y., 2007) .................................................................................................................................... 13
*In re Chevron Corp.*, 749 F.Supp.2d 170 (S.D.N.Y., 2010) ......................................................... 14
*In re McCray, Richardson, Santana, Wise, and Salaam Litigation*, 928 F.Supp.2d 748 (S.D.N.Y., 2013) ...................................................................................................................................... 9
*Matter of Holmes v. Winter*, 3 N.E.3d 694 (N.Y., Dec. 10, 2013) ................................................ 8
*Saint-Jean v. Emigrant Mortgage Company*, 2015 WL 13735434 (E.D.N.Y., October 7, 2015) 15
*Solargen Elec. Motor Car Corp. v. American Motors Corp.*, 506 F.Supp. 546 (N.D.N.Y., 1981) 6

**Statutes**

N.Y. Civ. Rights Law § 79-h ................................................................................................. 7, 12
N.Y. Civ. Rights Law § 79-h(a)(6) ............................................................................................. 8
N.Y. Civ. Rights Law § 79-h(g) ................................................................................................ 13

**Rules**

Fed. R. Civ. P. 45(c)(3)(A) ........................................................................................................ 12
Fed. R. Civ. P. 45(d)(3)(A)(iii) ................................................................................................... 7
Fed. R. Civ. P. 45(e)(2)(A)(i), (ii) .............................................................................................. 14
Fed. R. Evid. 501 ........................................................................................................................ 7
Fed. R. Civ. P. 45(d)(1) ............................................................................................................. 14
S.D.N.Y. Civ. R. 26.2 ................................................................................................................ 14

## INTRODUCTION

Defendants Moises Jimenez, James Tolbert, Kurtiss Staples, Eddie Croxton, and Alma Hughes-Grubbs ("Defendants") respond in opposition to non-party Sam Krevlin's ("Krevlin") Motion to Quash and further request this Honorable Court compel Krevlin to respond to both subpoenas for records and to appear for deposition pursuant to Defendants' Rule 45 subpoenas. Krevlin issued objections to Defendants subpoenas asserting protection under New York Reporters Shield Law and federal qualified reporter's privilege. Defendants seek an Order denying Krevlin's Motion to Quash and compelling Krevlin to, at a minimum, sit for a deposition in accordance with Defendants' subpoena. As explained more fully herein, Krevlin's motion should be denied because: (1) Krevlin waived the purported privilege by disclosing the information to the Wayne County Conviction Integrity Unit ("CIU"), (2) the material sought is likely relevant to the claims in the underlying case, and (3) the information and materials sought are not obtainable from another source.

## BACKGROUND

This is a reverse conviction case that arises from the conviction of Plaintiff, Kenneth Nixon ("Plaintiff"), for the 2005 firebombing of a home in Detroit in which two children were tragically killed. As part of the investigation into the fire, Defendant Moises Jimenez interviewed one of Plaintiff's cellmates, Stanley January. It is alleged that Defendant Jimenez told Mr. January he needed help with a case. It is further alleged that Defendant Jimenez fed Mr. January the information he wanted him to say about the fire, including false statements about Plaintiff making a confession to committing the crime. Per Plaintiff's allegations, Jimenez promised the informant a reduced sentence on his own pending case if he testified to this information at trial. Mr. January testified at trial, in relevant part, that he did not know Plaintiff before being in jail with him and

1

never saw anything about Plaintiff or the case prior to speaking with him. Following January's testimony, Plaintiff was convicted of arson, murder, and attempted murder.

In 2018, the CIU was asked to re-investigate Plaintiff's case. At the same time, Plaintiff submitted an application to the Medill Justice Project at Northwestern University in hopes the Project would investigate his case. Medill accepted Plaintiff's submission and began its investigation. Subsequently, in October of 2018, the Detroit Free Press published an article written by students from the Medill Justice Project titled, "Internal Memo, Prosecution Cast Doubt on Kenneth Nixon's Life Sentence." (Ex. 1, Detroit Free Press Article). The article was authored by Northwestern University journalism students, including Sam Krevlin. (*Id.*). The authors conducted an in-depth review of Plaintiff's case and purportedly uncovered "previously undisclosed internal memos." (*Id.*). Per Plaintiff, Krevlin and his fellow students were the first people to obtain an unredacted copy of these memos. (Ex. 2, Excerpt from MTD). The memo was authored by Defendant Kurtiss Staples and details several conflicting statements made by one of the main witnesses, 13-year-old Brandon Vaughn, throughout the investigation and trial. The conflicting statements prompted Defendant Staples to inform his Lieutenant that he believed the new statements were "obviously coached by family members." (Ex. 3, Staples Memo). Both the internal memos and the statements made by Mr. January during his interview with Krevlin are the focal points of Plaintiff's claims.

In 2020, as part of the CIU's investigation, Detective Tracy Weinert spoke with Krevlin over the phone in a recorded interview. (Ex. 4, recording/transcript). Per Krevlin, the students were tasked with contacting individuals involved in the case, conducting interviews, and locating individuals who may have been overlooked in the initial investigation. (*Id.*). Each student was tasked with investigating different leads and specific individuals. (*Id.*). Krevlin was tasked with

speaking to Stanley January. (*Id*.). Krevlin claimed to have conducted "multiple interviews" with January. (Ex. 1). Krevlin also purportedly traveled to Detroit and interviewed January face-to-face outside a clothing store. (Ex. 4). During the face-to-face interview January purportedly contradicted his trial testimony stating he knew the story of the firebombing prior to encountering Plaintiff because he saw it on the news. (Ex. 1). January would later go on to sign an affidavit recanting the entirety of his testimony. (Ex. 5, January Affidavit).

In speaking with Detective Weinert, Krevlin routinely and without hesitation offered information on each person he interviewed including names and locations of the interviews. Krevlin described his interviews with Stanley January, Jamil Kosho, and Mario Mahdi, as well as interviews conducted by other members of the project. (Ex. 4) Krevlin also informed Detective Weinert that he maintained memos, notes, and recordings of his interviews, which he offered to send her to assist in the investigation. (*Id*.). However, Defendants have reviewed all records produced by the Wayne County Prosecutor's Office and the CIU and further communicated with Wayne County to confirm that Krevlin did not send his memos, notes, or recordings.

On February 16, 2021, the CIU drafted a letter to the Honorable Bruce Morrow. (Ex. 6, CIU Letter). In the letter, the CIU laid out the findings from its investigation. In part, the CIU noted that "through their investigation, the Wayne County Conviction Integrity Unit learned that Mr. January knew of this case from the media surrounding (the case)." The CIU further noted "(t)his case centered on the identification of Mr. Nixon as the perpetrator of the crime. However, the new information regarding the testimony of Stanley January calls into question the reliability of the identification in this case." (*Id*.).

On February 18, 2021, following the CIU's investigation, a stipulated order was entered vacating Plaintiff's conviction and dismissing the case. Following dismissal, Plaintiff filed a

3

Complaint against Defendants and the City of Detroit. (Ex. 7, Plaintiff's Complaint). In his Complaint, Plaintiff alleges violations of 42 U.S.C. § 1983, and Michigan statutes for malicious prosecute and civil conspiracy. Since inception, the parties have engaged in extensive discovery. Based on the over 20,000 pages of records obtained thus far, it appears that Krevlin was the sole source of the information pertaining to Mr. January's testimony. Additionally, per Plaintiff, the first time he saw the unredacted Staples Memo was when Medill obtained it through a FOIA request. (Ex. 2).

On or about March 6, 2025, through March 7, 2025, counsel for Defendants engaged in communication with Krevlin and Krevlin's current counsel. (Ex. 8, Email Correspondence). Specifically, on March 6, 2025, Krevlin's counsel contacted Defendants' counsel purporting to represent Krevlin although indicating he was unsure whether he was authorized to accept service of the subpoena. (Ex. 8). Thus, on March 7, 2025, having not heard back from Krevlin's counsel, Defendants emailed the records subpoena to Krevlin. (*Id.*). Defendants' subpoena requested that Krevlin provide responsive records by March 28, 2025. The specific requests are attached hereto as Exhibit 9, but in relevant part, requested records in Krevlin's possession or control related to Kenneth Nixon, including witness statements, correspondence, notes regarding witness interviews, witness interviews, audio and visual recordings or transcripts, and documents received in response to FOIA requests, subpoenas, or other record requests. (*Id.*). Additionally, Defendants requested that Krevlin provide a privilege log should any documents be withheld. (*Id.*). In addition to the subpoena, Defendants explained to Krevlin the primary point of interest was (1) witness Stanley January, and (2) Medill obtaining the unredacted Staples Memo. (Ex. 8). On that same date, counsel for Krevlin indicated that Krevlin would not accept electronic service of the subpoena and that the subpoena was facially invalid. (*Id.*).

4

On March 13, 2025, Krevlin issued objections to the records subpoena. (Ex. 10, Krevlin Objections No. 1). Krevlin objected to the records subpoena asserting, (1) objections to service, (2) objections under FRCP 45(c)(2), (3) objections under the New York Reporters Shield Law, N.Y. Civil Rights Law § 79-h and federal qualified reporter's privilege, and (4) objecting that the subpoena was not clear that the records are highly material, relevant, and critically necessary to the claims and not obtainable from another source. Krevlin refused to provide documents and did not provide a privilege log. (*Id.*). In addition to the objections, Krevlin's counsel communicated to Defendants' counsel that if Defendants would withdraw the subpoena and issue a new one correcting the "facial invalidity" (i.e., change the address from Defendants' Detroit office to its New York office), then Krevlin would accept service of the subpoena. (Ex. 8). Defendants attempted to confer with Krevlin's counsel again to determine whether Krevlin would respond to the subpoena if corrected, to address any concerns that Krevlin had, and to explain why Defendants had to subpoena Krevlin. (Ex. 8). After such correspondence, numerous attempts were made to confer and resolve Krevlin's issues with the subpoena through the remainder of March and into April. (See *Id.*). Defendants' counsel proposed multiple solutions and narrowed the issues and requests to specific topics and documents. Unfortunately, attempts to confer with counsel for Krevlin on numerous occasions to narrow the issues and come to an amicable resolution were futile. Krevlin was uncompromising in his positions. Despite numerous attempts to correspond and Krevlin's written objections, Krevlin did not file a motion to quash the records subpoena.

On August 5, 2025, in a second attempt to communicate with Krevlin, Defendants issued a subpoena to take Krevlin's deposition, this time not requesting documents but merely testimony. (Ex. 11, Deposition Subpoena). Defendants informed Krevlin he did not need to travel to Detroit or even the New York office but could appear via Zoom. Nonetheless, Krevlin maintained his

position that he would not cooperate because he held protections under New York Shield Law and federal reporters' privilege.  On August 18, 2025, Krevlin once again served objections asserting protection under the New York Shield Law and federal qualified reporter's privilege. (Ex. 12, Dep Subp Obj). Again, the Defendants and Krevlin attempted to confer and determine if an agreement was possible, but again, Krevlin was unwilling to compromise in any meaningful way.  The parties met and conferred as recently as August 26, 2025, the date scheduled for Krevlin's deposition. Krevlin refused to appear. Krevlin's counsel, however, appeared via Zoom and was once again unwilling to compromise.  So much so, Krevlin's counsel advised that he would not agree to a deposition via Zoom but instead Krevlin's counsel insisted that any deposition must be in-person at the Movants New York office.

On August 29, 2025, following Krevlin's non-appearance for his deposition, Defendants deposed Stanley January.  During the deposition, Stanley January testified that he never spoke to Krevlin, was never interviewed by Krevlin, and did not know who Krevlin was. (Ex. 13, Stanley January Deposition Transcript).

Krevlin now files the instant motion seeking to quash the deposition subpoena, only.

## ARGUMENT

### I.     Krevlin Failed to Demonstrate Entitlement to Absolute Protection Under New York Shield Law or Federal Qualified Reporters' Privilege.

Federal Rule of Civil Procedure 26(b)(1) permits parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. While Rule 45 provides the procedural predicates for securing production of documents and depositions from non-party witnesses. *Solargen Elec. Motor Car Corp. v. American Motors Corp.*, 506 F.Supp. 546, 549 (N.D.N.Y. 1981).  A party may file to quash a subpoena, in part, if the subpoena "requires disclosure of privileged or other protected matter, if

6

no exception or waiver applies. Fed. R. Civ. P. 45(d)(3)(A)(iii). Federal courts determine whether materials are privileged by examining the principles set forth in Fed. R. Evid. 501 which provides:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

*von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2nd Cir. 1987).

Thus, before deciding whether Krevlin is entitled to any privilege, the Court must decide whether the privilege invoked by Krevlin is governed by federal or state law. *Id*.

Here, the underlying Complaint alleges both federal and state law claims. "In such situations courts consistently have held that the asserted privileges are governed by the principles of federal law." *Id*. As was the case in *von Bulow*, this case is a federal question case by virtue of the claims raised under 42 U.S.C. § 1983 with accompanying state law claims. *See Id*. at 142. Although federal law of qualified reporters privilege governs here, the Court "may consider [ ] the applicable state law." *Id*. at 144. However, while the Court may consider the applicable state law, which in this case would be New York's "Shield Law," N.Y. Civ. Rights Law § 79-h, it should also consider whether such a law is applicable to Krevlin, who has never been a journalist nor engaged in newsgathering activity **in New York**. *See Matter of Holmes v. Winter*, 3 N.E.3d 694, 707 (N.Y., Dec. 10, 2013) (wherein the Court of Appeals of New York indicated that "as a *New York reporter*, Winter was aware of – and was entitled to rely on – the absolute protection embodied in our Shield Law.") (emphasis added). Unlike Ms. Winter, Krevlin is not and never has been a New York reporter. Mr. Krevlin's invocation of New York's "Shield Law" implies the

7

illogical conclusion that Mr. Krevlin could invoke the journalistic protection of any given state simply by establishing residence there years after the relevant 'journalism' took place. This is illogical.

Additionally, should state law govern the question posited in his motion, Krevlin would not qualify for protection as a "professional journalist" as defined in N.Y. Civ. Rights Law § 79-h. *See* N.Y. Civ. Rights Law § 79-h(a)(6) (defining a professional journalist as "one who, for gain or livelihood is engaged in [newsgathering activities] . . . performing said function either as a regular employee or as one otherwise professionally affiliated for gain or livelihood with such medium of communication."); *see also Blum v. Schlegal*, 150 F.R.D 42, 44 (W.D.N.Y., 1993). In *Blum*, the non-party moving to quash a subpoena was a law student volunteering for the campus newspaper. *Blum*, 150 F.R.D. at 44. The plaintiffs there argued that the law student was not entitled to protection because he did not qualify as a "professional journalist." *Id*. The Western District declined to adopt the plaintiffs' argument stating that "(i)f state law governed this question, Plaintiff may well be correct" but finding that the federal law appeared to have a broader definition of "professional journalist." *Id*.

Accordingly, New York Reporters Shield Law is inapplicable here; the federal law of privilege should control the question of whether Krevlin is entitled to invoke any privilege to the information sought.

### A. Krevlin Failed to Meet His Burden to Establish Facts that are the Essential Elements of a Claim of Privilege.

The Second Circuit has "long recognized the existence of a qualified privilege for journalistic information." *Gonzales v. National Broadcasting Co., Inc.*, 194 F.3d 29, 32 (2nd Cir. 1999). Krevlin claims protection of federal qualified reporters' privilege because he was a journalism student in Illinois who, as part of a journalism program through his undergraduate

studies, engaged in an investigation into a potential wrongful conviction. (Ex. 4, Recording/Transcript, p. 2, line 19). However, while Krevlin explains what the privilege is, he ignores the first step in the equation, that is, "(i)t is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *Von Bulow*, 811 F.2d at 144.

Per Second Circuit precedent, Krevlin "must demonstrate, through competent evidence, the intent to use material – sought, gathered or received – to disseminate information to the public and that such intent existed *at the inception* of the newsgathering process." *Id*. (emphasis added). While Defendants do not dispute that the information obtained by the Project's investigation *resulted* in publication of an article in the Detroit Free Press, Krevlin has failed to show by competent evidence that the dissemination of the information collected was the ultimate intent at inception. *See In re McCray, Richardson, Santana, Wise, and Salaam Litigation*, 928 F.Supp.2d 748, 754 (S.D.N.Y., 2013) ("any discussion of the reporter's privilege begins with an inquiry into whether a journalist can first establish entitlement to the privilege by demonstrating the independence of her journalistic process."). In his motion, Krevlin produced a sworn declaration stating that he attended journalism school at Northwestern and investigated Plaintiff's case. This alone is not enough to meet his burden. As such, Krevlin has not established his entitlement to the privilege.

### B. The Information and Materials Sought From Krevlin Are Relevant to a Significant Issue in the Case and Cannot be Obtained from Other Sources.

Assuming Krevlin has met his burden to show entitlement to the privilege, his claim must be analyzed under the lesser standard for non-confidential press materials. Krevlin does not argue that any of the materials and information in his possession were obtained in confidence. The article does not claim that any information was obtained from confidential or anonymous sources and

9

Krevlin did not claim such when speaking to Detective Weinert, nor does Krevlin assert such in his motion. To be sure, "(t)he burden of proving confidentiality rests with the journalist." *Blum*, 150 F.R.D. at 44. When press materials and information were not obtained in confidence, the Court need only determine two things, (1) whether the materials and information "are of likely relevance to a significant issue in the case" and (2) whether the materials and information contain information not reasonably obtainable from other available sources. *Gonzales*, 194 F.3d at 36.

When Detective Weinert interviewed Krevlin regarding his investigation and reporting into Plaintiff's case, he specifically told Detective Weinert that he alone was tasked with looking into and interviewing Stanley January. (Ex. 4). As Krevlin stated to Detective Weinert, he met Mr. January in Michigan in 2018. (*Id*.). Per Krevlin's supposed reporting, Stanley January learned of the information regarding the firebombing from the news reports he observed in jail. (Ex. 1). This statement was contrary to his trial testimony in which he stated he had no knowledge of the firebombing prior to meeting Plaintiff. This is relevant to the present case for two primary reasons: (1) if Stanley January learned of the firebombing from the news story, it would contradict Plaintiff's claims that he was fed the information by Defendant Jimenez; and (2) the CIU relied upon the interview of Stanley January by Krevlin to justify their order setting aside Plaintiff's conviction.

Information Krevlin obtained from January is relevant and significant to the issues in this case because it is one of the primary reasons there even is a case. Furthermore, Defendants deposed Mr. January on August 29, 2025. (Ex. 13). Defendants questioned Mr. January regarding his interview with Krevlin. Defendants specifically asked Mr. January if he recalls speaking to Sam Krevlin in 2018. (*Id*.). Not only did Mr. January testify that he was not living in Michigan in 2018, but he claims he never met Krevlin, never talked to Krevlin, and does not know who Krevlin

10

is. (*Id*. at 154-156). Mr. January went on to testify that it would be false to state he was interviewed by Sam Krevlin. (*Id*. at 156). Mr. January further testified that he was never interviewed by anyone from the CIU including Detective Weinert. (*Id*.). Based on Mr. January's testimony, Krevlin's interactions and investigation into Mr. January become even more relevant as Mr. January's testimony now calls into question the credibility and veracity of Krevlin's statements in the Detroit Free Press article and his statements to Detective Weinert. As it stands, Mr. Krevlin is the only person who can shed light on the discrepancy put forth through Mr. January's testimony.

Mr. Krevlin's claimed interview and meeting with Mr. January directly led to the CIU setting aside the conviction at issue in this case. According to the sworn testimony of the only other party to the claimed interview and meeting, Mr. Krevlin fabricated the interview entirely, and the purported meeting did not, and indeed, could not physically have occurred. Therefore, the information sought is both relevant and not obtainable from any other source.

Accordingly, Krevlin's motion must be denied, and he should be ordered to comply with Defendants' subpoenas by producing any memos, notes, or recordings pertaining to his purported interview with Stanley January. At the very least, Krevlin should be ordered to comply with Defendants' deposition subpoena and testify at a deposition to testify regarding these significant discrepancies that call into question both the credibility of the CIU's decision and Krevlin's personal integrity.

  **II.**   **Krevlin Waived Any Privilege Under Federal Qualified Reporters Privilege and New York Reporters Shield Law by Disclosing the Proclaimed Protected Information to a Non-Protected Third-Party and Failing to Provide a Privilege Log.**

Even if the Court determines that Krevlin is entitled to invoke the federal reporters' privilege he is not entitled to its protection because he previously waived the privilege by

disclosing the information and materials sought when he voluntarily spoke to Detective Weinert regarding his investigation into Plaintiff's case.

Pursuant to Fed. R. Civ. P. 45(c)(3)(A), a court must quash a subpoena if it requires disclosure of privileged information, unless an exception or waiver applies. Courts in this district have looked to New York's Shield Law, N.Y. Civ. Rights Law § 79-h, for guidance to determine issues of waiver in cases where an individual invokes reporter privilege. *See In re Air Crash at Belle Harbor, New York on November 12, 2001*, 241 F.R.D. 202, 204 (S.D.N.Y. 2007) (finding the privilege under New York Shield Law had been waived after disclosure to a person not otherwise entitled to claim the exemptions provided by the law). Under New York's Shield law,

> a person entitled to claim the exemption provided under subdivision (b) or (c) of this section waives such exemption if such person voluntarily discloses or consents to disclosure of the specific information sought to be disclosed to any person not otherwise entitled to claim the exemptions provided by this section.

N.Y. Civ. Rights Law § 79-h(g).

Here, Krevlin waived any claim of privilege when he voluntarily disclosed the specific information regarding his investigation to Detective Weinert of the CIU. (See Ex. 4). Detective Weinert is not a person "entitled to claim the exemptions provided by [N.Y. Civ. Rights Law § 79-h]." *Id.* Until receiving the two subpoenas referenced in these pleadings, Krevlin never claimed any privilege and never claimed any of his information or sources were confidential. Further, not only did Krevlin disclose the information verbally, but he consented to disclosing his notes, memos, recordings, etc., to Detective Weinert.

Additionally, while Krevlin does not appear to move this Court to quash the subpoena *deuces tecum*, he has also waived privilege as it relates to the documents requested, e.g., the notes, memos, recordings he claimed to have during his interview with

12

Detective Weinert. (Ex. 4). Should the non-party withhold the subpoenaed information under a claim of privilege he must, "(1) expressly make the claim; and (2) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(e)(2)(A)(i), (ii). In fact, this Court has previously held that if a person objects to a subpoena and withholds records on the ground of privilege, he must provide a privilege log. *In re Chevron Corp.*, 749 F.Supp.2d 170, 180 (S.D.N.Y., 2010). This Court additionally relied on S.D.N.Y. Civ. R. 26.2 in stating, "the starting position is that the privilege log must be served with the objections or motion to quash . . . failure to do so may result in waiver of the privilege claims. *Id*. at 181. Here, Krevlin has failed to produce a privilege log either with his objections or this motion and thus has waived the privilege.

Krevlin has waived protection of New York's Shield Law and federal qualified reporters' privilege. Accordingly, Krevlin's motion must be denied, and he be ordered to comply with Defendants' subpoenas by appearing for deposition and producing the relevant records.

### III. Krevlin Is Not Entitled to Attorneys' Fees

Krevlin is not entitled to attorney's fees because Defendants' subpoena did not impose an undue burden on him as the information sought has been shown to be relevant and Defendants also took reasonable steps to modify the information sought and narrow the scope to the issues of Stanley January and the Staples Memo.

Federal Rule 45(d)(1) permits appropriate sanctions which may include reasonable attorneys' fees if the party serving the subpoena does not take reasonable steps to avoid undue

13

burden or expense upon the individual subject to the subpoena. "Before imposing sanctions under Rule 45(d)(1), a court must conduct a two-part inquiry to determine: (1) whether the challenged subpoena imposed an undue burden or expense on the person(s) subject thereto; and (2) if so, what, if any, 'reasonable steps' the subpoenaing party and its counsel took to avoid imposing such a burden. *Saint-Jean v. Emigrant Mortgage Company*, 2015 WL 13735434, at *3 (E.D.N.Y., October 7, 2015) (emphasis added).

Defendants do not dispute the analysis into the "undue burden" prong is "tied to the relevance of the material sought and is directly related to the court's decision to quash a subpoena imposing an undue burden. *See Breaking Media, Inc. v. Jowers*, 2021 WL 1299108, at *7 (S.D.N.Y., April 7, 2021). Krevlin is unable to satisfy this prong because it is clear the topics sought to be covered at the deposition are no longer privileged. Additionally, it is apparent that the topics sought to be covered, and the information requested, are relevant to the claims in this case, particularly since Krevlin is the only person who has interviewed Mr. January, and Mr. January has testified under oath that he never met or spoke to Krevlin.

As to the second prong, Defendants attempted to narrow the scope of both the subpoena for records and the deposition subpoena. Standing alone, this would preclude attorneys' fees. *See Id*. at *8 (finding that the respondents refused to narrow the scope of the subpoena or address petitioner's objections on privilege, relevance, and proportionality). Defendants have addressed each one of Krevlin's objections and narrowed the scope of the subpoenas. (See Ex. 7 and 8). While Krevlin argues that Defendants "refused to research their position," this statement is patently false. Defendants had conducted significant research into this topic, as evidenced by the instant memorandum of law, and believe in good faith that there is sufficient foundation to issue the subpoena. (See Ex. 8). Krevlin has failed to cite any law that would require Defendants to

14

present to him what would amount to a research memorandum when attempting to negotiate a discovery dispute. Nevertheless, as evidenced by the numerous emails attached hereto, Defendants explained their position to Krevlin and why they believed it was justified.

For the aforementioned reasons, Krevlin is not entitled to attorneys' fees and Defendants respectfully request this Honorable Court deny his request and order that Krevlin comply with Defendants' subpoenas.

## CONCLUSION

For these reasons, Defendants respectfully request this Honorable Court deny Krevlin's Motion to Quash the Deposition Subpoena and request for attorneys' fees. In doing so, Defendants further request the Court order Krevlin to comply with Defendants' subpoenas by appearing for a deposition on the relevant topics discussed above and producing documents responsive to Defendants' subpoena.

          NATHAN & KAMIONSKI, LLP

          */s/ Joseph Gutmann*
          Joseph Gutmann (NY 5221429)
          Shneur Z. Nathan (NY 4733010)
          Attorney for Defendants, Jimenz, Tolbert, Staples, Croxton & Grubbs
          343 Maple Avenue
          Westbury, NY 11590
          512-620-0370
          jguttman@nklawllp.com
          snathan@nklawllp.com

Dated: September 17, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2025, I electronically filed the foregoing pleading with the Clerk of the Court by using the CM/ECF system, which will send notification to all registered parties.

                                      */s/ Kimberly A. Moin*
                                      Kimberly A. Moin, Paralegal