# EXHIBIT 4

Interview

1            STATE OF MICHIGAN

2

3

4   Re:

5   The matter of Kenneth Nixon

6   and the Medill Justice Project

7   _____//

8   Pages 1 to 27

9       The transcription of the interview

10       of Sam Krevlin conducted by

11       Detective Tracy Weinhart.

12

13

14   *Anything denoted as (inaudible) is due to audio quality or

15   speaker crosstalk.

16

17

18

19

20

21

22

23

24

25

1    I N T E R V I E W

2

3    DET. WEINHART:  Okay.  We're good.  So I work

4  at the Wayne County Prosecutor's Office as a detective,

5  and I work for the Conviction Integrity Unit.  So what

6  we do, is I work specifically with Cooley Innocence

7  Project out of Lansing, and we work on cases of

8  potential innocence once people apply with us and with

9  Cooley.  So I specifically work DNA grants, but I look

10  at all aspects of cases, as well.

11       So the reason that I was reaching out to you

12  is regarding Kenneth Nixon and the article that was

13  written for the Medill Project when you were at

14  Northwestern.

15       MR. KREVLIN:  Yes.

16       DET. WEINHART:  So I just wanted to know if

17  you could give me a little background about your

18  involvement with that?

19       MR. KREVLIN:  Definitely.  So I was part of a

20  group of students that Northwestern University has a

21  program where they look into potential wrongful

22  convictions.  I was not part of the group that selected

23  the case.  I think that goes through, kind of, its own

24  administrative process.

25       DET. WEINHART:  Okay.

1        MR. KREVLIN:  But in the class, we were

2   assigned the Nixon case.  So it started off with, you

3   know, reading trial transcripts and other -- anything,

4   you know, Kenneth Nixon provided us with, I think.  You

5   know, a bunch of evidence and all the paperwork that

6   most, or hopefully all the paperwork he had.  I'm not

7   sure if it was all, and I'm sure that there's more

8   that's been uncovered since.

9        DET. WEINHART:  Right.

10        MR. KREVLIN:  But whatever evidence we had,

11   we looked at.  And then we did -- you know, it was more

12   a journalism side of things.  So it was contacting, you

13   know, people who were involved with the case trying to

14   get interviews and kind of expand, maybe, the umbrella

15   in terms of the people who were involved, maybe those

16   who weren't looked into by authorities initially at the

17   time --

18        DET. WEINHART:  Right.

19        MR. KREVLIN:  -- that were overlooked --

20        DET. WEINHART:  Gotcha.

21        MR. KREVLIN:  -- in terms of the initial

22   investigation.  We kind of tried to close, maybe, some

23   of those holes.

24        DET. WEINHART:  Okay.

25        MR. KREVLIN:  So, yeah.

1      DET. WEINHART:  Do you remember or have any

2  notes or anything specific on who you may have talked

3  to regarding any witnesses on the case or people that

4  were related to the case, whether they were originally

5  reached out to by Detroit PD or not?

6      MR. KREVLIN:  Yeah, so we made one trip to

7  Detroit in person.

8      DET. WEINHART:  Okay.  And when you say we,

9  do you remember who it was with?

10      MR. KREVLIN:  Yeah.

11      DET. WEINHART:  Okay.

12      MR. KREVLIN:  It was me, um -- one second --

13  and the other members of the class.

14      DET. WEINHART:  Okay.  Okay.

15      MR. KREVLIN:  So I can get you their names.

16      DET. WEINHART:  That's okay.  I just thought

17  if you might know.  So when you guys came down to

18  Detroit, who did you guys have contact with?

19      MR. KREVLIN:  Right.  So we each had

20  different leads that we were, kind of, assigned to --

21      DET. WEINHART:  Okay.

22      MR. KREVLIN:  -- based off of how we divvied

23  up the work.  I specifically was looking to get in

24  touch with Stanley January.

25      DET. WEINHART:  Okay.

Interview

1      MR. KREVLIN:  And Jamil Koscho was another

2   figure --

3      DET. WEINHART:  Okay.

4      MR. KREVLIN:  -- I was looking into.  I think

5   that's his name.  I'm sorry, I don't have --

6      DET. WEINHART:  No, you're right.

7      MR. KREVLIN:  -- the name on me.

8      DET. WEINHART:  Nope, you're good.  Yep.

9      MR. KREVLIN:  But those were the two.

10      DET. WEINHART:  Okay.

11      MR. KREVLIN:  And then while we were there,

12   we spoke to Kenneth's brother and his girlfriend at the

13   time, and I'm forgetting her name.

14      DET. WEINHART:  Okay.  Was that possibly

15   LaToya Caulford?

16      MR. KREVLIN:  It was LaToya.

17      DET. WEINHART:  Okay.

18      MR. KREVLIN:  And their son --

19      DET. WEINHART:  Right.  Right.

20      MR. KREVLIN:  -- we met with.

21      DET. WEINHART:  Okay.  Um, specifically with

22   Stanley January, did you ever make contact with him, if

23   you recall?

24      MR. KREVLIN:  Yes.

25      DET. WEINHART:  Okay.  You did?

Interview

1     MR. KREVLIN:  Yeah.

2     DET. WEINHART:  And do you remember where

3  that may -- like, was it at a house?  A store?  A

4  business?

5     MR. KREVLIN:  It was outside a store.

6     DET. WEINHART:  Okay.

7     MR. KREVLIN:  And it was outside -- it was a

8  clothing store.

9     DET. WEINHART:  Okay.

10     MR. KREVLIN:  And -- one second.

11     DET. WEINHART:  Sure.  And if you don't

12  recall exactly where it was, that's fine.  I guess my

13  main question would be:  Do you recall the gist of the

14  conversation?  Or you know, anything that you guys --

15     MR. KREVLIN:  Yeah.

16     DET. WEINHART:  Okay.

17     MR. KREVLIN:  Stanley, you know, is -- was --

18  I mean, in our interactions, he was someone who, a

19  little all over the place.

20     DET. WEINHART:  Okay.

21     MR. KREVLIN:  His -- you know, I wouldn't say

22  he was the most trustworthy character.

23     DET. WEINHART:  Okay.  Now, would you say he

24  comes across as, like, mental illness all over the

25  place?  Addicted to something all over the place?  Or

Interview

1  maybe a combination of both?

2      MR. KREVLIN:  I don't want to diagnosis

3  anyone.

4      DET. WEINHART:  Okay.  Gotcha.

5      MR. KREVLIN:  But I would say -- I don't want

6  to diagnosis anyone with anything.

7      DET. WEINHART:  Right.

8      MR. KREVLIN:  I would say that his, um --

9  yeah.  Sorry, I don't --

10      DET. WEINHART:  Okay.

11      MR. KREVLIN:  But it didn't seem like he was

12  a trustworthy figure.

13      DET. WEINHART:  Okay.  And are you saying

14  that because you feel like his story was all over the

15  place?

16      MR. KREVLIN:  So, I'm saying that because he

17  seems like somebody -- so initially, he would only talk

18  if he was gonna get paid.

19      DET. WEINHART:  I see.  Okay.  I gotcha.

20  Yeah, we encounter that quite a bit, so yeah.

21      MR. KREVLIN:  And then, it was also a matter

22  of, when I talked to him, he said he had certain

23  evidence in his house.  And I followed him from the --

24  and I walked -- or I met with him at this clothing

25  store.  And he was like, I gotta get -- you know, I

1  gotta get home for some reason.  He kind of, like,

2  skirted, tried to get away from (inaudible).  But he

3  was like, meet me at my home, so I met him outside of

4  his home.  I never went inside.

5        DET. WEINHART:  Okay.

6        MR. KREVLIN:  And he was like, yeah, I got

7  this evidence stuff upstairs, which he never had --

8  never, um, you know, coughed up.

9        DET. WEINHART:  Right.  You never saw

10  anything?

11        MR. KREVLIN:  And I -- honestly, I doubt he

12  has anything, because I think he was just trying to see

13  where he could get something out of this.

14        DET. WEINHART:  Right.

15        MR. KREVLIN:  He's very transactional in

16  nature.

17        DET. WEINHART:  Okay.

18        MR. KREVLIN:  And which led to, I think, a

19  lot of the crux of, kind of, the case.  Like what he

20  can, you know --

21        DET. WEINHART:  Right.

22        MR. KREVLIN:  -- it didn't surprise me based

23  off anything that I read in the trial transcript.

24        DET. WEINHART:  Right.  And he never told you

25  what it was evidence wise that he had at his house?  Or

1  if you remember?  If you don't remember, that's

2  understandable.

3      MR. KREVLIN:  I don't.  I'd have to look at

4  the memo that I wrote on the interaction.

5      DET. WEINHART:  Okay.  Do you remember -- in

6  the article that I was reading, it talks about the fact

7  that during the trial, he stated that he didn't have

8  any knowledge of the crime, that he had never seen it.

9  But then later, once he spoke to somebody, either, you

10  know, at the project that you guys worked on, that he

11  told them that he had seen it he on the news prior.

12  Does that sound familiar at all?  And that's just based

13  on what is in the article that I read.

14      MR. KREVLIN:  Say that -- sorry.  Can you say

15  that again?

16      DET. WEINHART:  Sure.  During the trial, when

17  he was asked if he had seen any coverage of the news

18  story regarding the incident, he stated that he had

19  not.  But then apparently -- you know, at some point

20  when this article's written, he told somebody from the

21  project that he had seen the news, everybody knew about

22  the case, because it was so high profile.

23      MR. KREVLIN:  Yeah.

24      DET. WEINHART:  Okay.

25      MR. KREVLIN:  That is -- that is -- I

Interview

1   believe.  I'm not 100 percent certain.

2        DET. WEINHART:  Okay.  Okay.

3        MR. KREVLIN:  But I believe there was a

4   discrepancy in terms of if he saw it or not.  And I

5   think he said that he -- yeah.

6        DET. WEINHART:  Okay.  I gotcha.  Once you

7   guys made that trip to Detroit, did you guys ever

8   have -- so he went in the house, but he never came

9   forward with any type of evidence.  What was your --

10  did you guys continue to talk to him outside, even

11  though he wasn't really producing anything?  Or was he,

12  kind of, done talking at that point?

13       MR. KREVLIN:  I believe I tried to follow up.

14  It didn't -- I never -- I think after that, he stopped

15  responding.

16       DET. WEINHART:  Okay.  Okay.

17       MR. KREVLIN:  Yeah.  Yeah.  He stopped

18  responding.

19       DET. WEINHART:  Okay.  And your impression

20  was, in essence, he was looking to get something out of

21  it?

22       MR. KREVLIN:  I just think it was like, he

23  felt like there was nothing -- you know, why was he

24  gonna talk if he wasn't going to --

25       DET. WEINHART:  Benefit from it?  Right.

Interview

1        MR. KREVLIN:  Yeah.  It just didn't seem like

2   he was willing to -- to help in any way.

3        DET. WEINHART:  Okay.

4        MR. KREVLIN:  Not even from a standpoint that

5   I feel like he felt like he would have been on the

6   hook, like if he were --

7        DET. WEINHART:  Right.

8        MR. KREVLIN:  -- if he was untruthful at the

9   time.  Like, I honestly didn't think he honestly cared

10  about that at all.  I think it was mainly he just

11  didn't -- he just didn't -- that's why he was a little

12  bit frustrating, honestly.

13       DET. WEINHART:  Right.

14       MR. KREVLIN:  Because it's like, we have this

15  guy who potentially has information.  Who, at points,

16  seems willing, and then at points, doesn't seem willing

17  and you really don't know what his rationale is.

18  That's I think why to me -- like when I described,

19  like, he's untrustworthy, it's like you don't really

20  know where he's coming from.

21       DET. WEINHART:  Right.  Okay.  And then I

22  know -- so would you say you had a fair amount of

23  contact with him prior to coming down to Detroit, if

24  you recall?  Or how many times you may have spoken to

25  him prior to actually coming down?

1        MR. KREVLIN:  Probably, I think -- I can't

2    tell you the number of times.

3        DET. WEINHART:  Okay.

4        MR. KREVLIN:  It was minimal contact.

5        DET. WEINHART:  Okay.

6        MR. KREVLIN:  And it was only in an effort to

7    meet up with him when we got to Detroit.  There were,

8    maybe -- there was an initial interview which I don't

9    even think was on the record.

10        DET. WEINHART:  Okay.  Gotcha.  Did you guys

11    record any of your conversations with anybody?  Or how

12    did guys --

13        MR. KREVLIN:  We did.

14        DET. WEINHART:  You did, okay.

15        MR. KREVLIN:  At least I did.

16        DET. WEINHART:  Okay.  And is that something

17    you would have, do you think?

18        MR. KREVLIN:  I would need to check.

19        DET. WEINHART:  Okay.

20        MR. KREVLIN:  I would have to check.

21        DET. WEINHART:  Okay.

22        MR. KREVLIN:  I'm not --

23        DET. WEINHART:  And I know that somebody

24    else -- we've been trying to reach out to somebody

25    actually at the project that, you know, where they

Interview

1   could actually access -- because I know I talked to

2   somebody else, and she said that they would probably

3   have to access, like, a shared drive that you guys

4   would actually dump your work into, so I guess that's

5   something we're looking into, as well.

6        MR. KREVLIN:  There's also been a huge

7   turnover, like in terms of the Medill Justice Project.

8        DET. WEINHART:  Really?

9        MR. KREVLIN:  I'm not sure -- yeah.

10       DET. WEINHART:  Okay.

11       MR. KREVLIN:  I mean, there's a new head of

12   investigative programs at Northwestern.

13       DET. WEINHART:  Okay.

14       MR. KREVLIN:  And I think they've shifted,

15   just a little bit, about how they operate.

16       DET. WEINHART:  Okay.

17       MR. KREVLIN:  So, yeah.

18       DET. WEINHART:  Okay.  Yeah, because I think

19   I reached out to -- I got a lot of different names, but

20   like, Alicia, Ashley, Sydney, just looking at other

21   people that may have had contact as well at the same

22   time.

23       MR. KREVLIN:  Yeah.

24       DET. WEINHART:  Do you remember if you had

25   any contact or worked on anything with any of the other

Interview

1  witnesses in this case?  Or anybody that was relevant

2  to the case?

3       MR. KREVLIN:  So there was one lead that --

4  there was, like, an unsigned affidavit.  I'm not

5  sure -- and I'm forgetting the circumstances, but I

6  think it was someone that Kenneth's mom may have had a

7  relationship with.

8       DET. WEINHART:  Okay.

9       MR. KREVLIN:  I'm trying to think.  I don't

10  know if that lead -- I just remember we were trying to

11  find this person who may have known something.

12       DET. WEINHART:  Gotcha.

13       MR. KREVLIN:  I can't -- does that ring any

14  bell?  Or not really?

15       DET. WEINHART:  No.  Nope.

16       MR. KREVLIN:  It doesn't at all?

17       DET. WEINHART:  Nope.

18       MR. KREVLIN:  Okay.

19       DET. WEINHART:  Yeah, I mean, it's been a

20  little bit.  And you know, I'm sure you have a lot on

21  your plate.

22       MR. KREVLIN:  I'm just -- I'm trying to think

23  of -- it's hard because we all -- like I said, we

24  divvied up some of the work.  So, like, Stanley January

25  and this guy, Jamil Koscho, were two people that I was

1  looking into, but everyone kind of had their own person

2  they were trying to interview.

3      DET. WEINHART:  Okay.  Did you have any

4  contact with Jamil Koscho?  Or reach out to him at all

5  that you remember?

6      MR. KREVLIN:  Yeah.  So we reached out to

7  him, because for whatever reason, I think Kenneth

8  thought that he was involved, or I think he owned the

9  home, maybe.  Maybe he didn't own the home, but would

10  have profited off of the home being burned.  I don't

11  know if that --

12      DET. WEINHART:  Oh, being the owner,

13  landlord.  Yeah, I gotcha.  Okay.

14      MR. KREVLIN:  We looked into it.  He -- I

15  think I (inaudible) that conversation, honestly.

16  Initially, he was kind of like, fuck you.  I don't want

17  to talk to you.  Or he just hung up on me.  He

18  literally just hung up on me.  Sorry, like I said, my

19  memory isn't --

20      DET. WEINHART:  Yeah, no problem.  No

21  problem.

22      MR. KREVLIN:  Yeah.  He hung up at first.  I

23  called back.  And then I think he kind of just -- it

24  was just an end.  I got nothing out of it.  Yeah, in

25  terms of just my questions.

Interview

1       DET. WEINHART:  Right.

2       MR. KREVLIN:  He kind of just denied, um, any

3   insinuation that he may have been involved.

4       DET. WEINHART:  Okay.  Gotcha.  Anyone else

5   that you remember having contact with?  I mean, I know

6   it was a group effort, so I know that there were a lot

7   of you reaching, like you said, to different people,

8   but --

9       MR. KREVLIN:  Um, there are just so many --

10   sorry, I'm, like, looking through some stuff.

11       DET. WEINHART:  Okay.

12       MR. KREVLIN:  And there's just a lot of

13   actors involved in this.

14       DET. WEINHART:  Okay.  Gotcha.

15       MR. KREVLIN:  Like, Mario Mahdi who was a --

16   who was, I think LaToya's cousin.

17       DET. WEINHART:  Okay.

18       MR. KREVLIN:  And Mario Mahdi was, I think,

19   at the home -- at Kenneth's home the night of the

20   Molotov cocktail incident.

21       DET. WEINHART:  Okay.

22       MR. KREVLIN:  And Mario Mahdi, I got on the

23   phone.

24       DET. WEINHART:  Did you find him to be

25   cooperative, if you remember?

Interview

1      MR. KREVLIN:  Somewhat cooperative.

2      DET. WEINHART:  Okay.

3      MR. KREVLIN:  Somewhat cooperative.  He

4  moved.  I don't think he lives in Michigan anymore.

5      DET. WEINHART:  Okay.  Did you have any

6  contact directly with Kenneth Nixon, do you remember?

7      MR. KREVLIN:  Yeah, we met with Kenneth.

8      DET. WEINHART:  Okay.

9      MR. KREVLIN:  At Michigan Reformatory.

10      DET. WEINHART:  Gotcha.  And impression wise,

11  what did you think when you interviewed him?

12      MR. KREVLIN:  Um, so I thought he was

13  genuine, like, he seemed genuine.

14      DET. WEINHART:  Right.

15      MR. KREVLIN:  He's someone that -- you know,

16  it's hard, because I think more people in my journalism

17  group were way more inclined to show more sympathy and

18  show more -- show more sympathy to Kenneth.

19      DET. WEINHART:  Okay.

20      MR. KREVLIN:  I tried to, as much as

21  possible, remain objective and try to look more at the

22  evidence of the case.

23      DET. WEINHART:  Right.

24      MR. KREVLIN:  I tried not to let, you know,

25  how he presented himself deter my understanding of what

1  may or may not have happened.

2      DET. WEINHART:  Right.

3      MR. KREVLIN:  My initial impression of the

4  case as a whole was that I never thought there was

5  enough evidence -- and this is me, personally -- to

6  have convicted him, initially.

7      DET. WEINHART:  Okay.

8      MR. KREVLIN:  But I never thought, based off

9  of -- if I were a jury member, I wouldn't have

10  convicted him, because I don't think there was, you

11  know, beyond a reasonable doubt that he did it.  I

12  think there was too much going on and there was too

13  little police work done at the time to confirm it,

14  that's how I initially perceived it, but I also never

15  thought that there was something that could get him

16  out.  I don't know if that makes sense?

17      DET. WEINHART:  Yes.  Yes.

18      MR. KREVLIN:  Like, (inaudible) there.

19      DET. WEINHART:  Right.

20      MR. KREVLIN:  We were searching for something

21  to get and I wasn't sure that -- you know, like the

22  jury made, I guess, a decision that I disagreed with,

23  and I don't know how you can counteract that.  I mean,

24  unless by finding other, you know, evidence or ways to

25  show that he was actually innocent which we weren't

Interview

1   able to find.  I guess we made (inaudible) that we

2   weren't able to find.  But my initial impression was,

3   good guy, definitely like a loving father.

4          DET. WEINHART:  Right.

5          MR. KREVLIN:  Someone who, you know, I

6   believed -- I believed his story, but I also know there

7   are times when, you know, when you're in the situation

8   that he's in -- not that -- sometimes you believe and

9   you try to believe -- you know, sometimes you can

10   believe your lies, I think --

11          DET. WEINHART:  Right.

12          MR. KREVLIN:  -- but I genuinely thought he

13   was a good guy.

14          DET. WEINHART:  Okay.

15          MR. KREVLIN:  A good guy.  I think that if he

16   were to leave -- if he were to get out, I think he, as

17   long as our society, which does a terrible job of this,

18   in terms of forgiveness and letting them back into

19   society and giving them a second chance, I believe he

20   would be an extremely productive member of society.

21   Like I said, lots of barriers systemically in terms of

22   people who are incarcerated.

23          DET. WEINHART:  Right.  And we see it often.

24   We have about, I don't know, I think maybe 24 or 25

25   exonerations since we started a few years ago.  And

Interview

1  it's a hard adjustment, as well, you know, just

2  personally for the people that are getting out after

3  being, you know, incarcerated young and knowing nothing

4  else and then getting out and trying to function.  This

5  is just a whole different world.

6          MR. KREVLIN:  Yeah.  I mean, there's the

7  aspect of the conditions inside -- inside a prison,

8  inside a jail that are also inhumane, and then there

9  are -- there's the -- yeah, exactly what you're saying.

10          DET. WEINHART:  Right.  I mean, and to just

11  throw somebody out in the world and say, well, you

12  know, here you are.  Good luck.  It's difficult.

13          MR. KREVLIN:  Right.

14          DET. WEINHART:  And even -- you know, even

15  though we have a lot of prisoners, you know, receiving

16  monetary settlements, et cetera, it's mental.  It's the

17  mental adjustment.  And, you know, who is there for

18  them legitimately?  Who's there for them because they

19  financially provide now, so, yeah, it's challenging.

20  That's something I think anybody that works with an

21  innocence project is working on, the aftercare of

22  people, if they are released, then what happens next

23  which is a work in progress on our end.

24          MR. KREVLIN:  Yeah.

25          DET. WEINHART:  But we have a pretty good

1    team.  I mean, the detectives were retired from Detroit

2    PD Homicide.  All of our attorneys have, you know,

3    25-plus years of experience, most of them, in defense

4    work.

5        MR. KREVLIN:  Yeah.  So, I have a question

6    for you, because I, you know, at the time and still

7    now, I'm not totally -- what are the viable options in

8    terms of best case scenario -- best case scenario, how

9    would someone in Kenneth's position get free?

10        DET. WEINHART:  Right.  So the options are

11    for our unit, once a complete investigation is done --

12    and I do specifically DNA cases, but if I've started a

13    case, sometimes I'll keep it, even if it goes beyond

14    the DNA.  So, we have exonerations just based on DNA

15    alone, so it could either be a complete exoneration, or

16    it could be a new trial.  But typically, what's

17    happening is due to the age of the cases, they're

18    making a choice to not retry it due to the fact that we

19    have -- you know, most of the cases that I work on, a

20    lot of the witnesses are deceased, a lot of the

21    evidence has been destroyed, missing.  Some of these

22    departments, they've had floods and other incidents

23    where, truly the stuff just doesn't exist to test.

24        MR. KREVLIN:  Right.

25        DET. WEINHART:  So we kind of look at a

1  totality of circumstance.  Once we come to a conclusion

2  as a team, we present it to Prosecutor Worthy and she

3  has the ultimate say in what happens with the case.  So

4  we go in, we have a team conference with her.  We

5  discuss the case, let her know what our belief is, if

6  we think it should be an exoneration, if we think that

7  they deserve a new trial.  And it's kind of a totality

8  of things.  It's a look at DNA.  It's looking at if

9  there were Brady violations.  If there was any type of

10  corruption on the part of law enforcement.  If there

11  was any type of prosecutorial misconduct, so there's

12  just so many variables.

13      MR. KREVLIN:  Right.

14      DET. WEINHART:  But typically for us, it

15  would either be an exoneration or it would be a new

16  trial.

17      MR. KREVLIN:  Got it.

18      DET. WEINHART:  And if they want to retry it,

19  obviously, Prosecutor Worthy would make that call and

20  let the supervisors at the prosecutor's office know.

21  But thus far, the granting of new trials, they have not

22  retried a case yet.

23      MR. KREVLIN:  Got it.  And are prosecutors --

24  what's their incentive to retry it?  Wouldn't it show

25  that their original prosecutors screwed -- is there

1  any, like, incentive for them to --

2      DET. WEINHART:  I don't know -- yeah, I don't

3  know incentive wise if there would be as much as --

4  like I said, the age of most of our cases on average is

5  about 20-plus years, and 20-plus years is beyond

6  retention of anything for most departments, and that

7  could be police files, evidence.  So unfortunately, a

8  lot of times, like just with myself working on DNA

9  grant, there's nothing to retest, because the

10  property's been destroyed.

11      MR. KREVLIN:  Is that with the Molotov

12  cocktail in this case?

13      DET. WEINHART:  Well, we have all of the

14  evidence.

15      MR. KREVLIN:  You do?

16      DET. WEINHART:  So we pretty much have

17  everything we need, yeah, so.

18      MR. KREVLIN:  So you do have the Molotov

19  cocktail?

20      DET. WEINHART:  So we have all the evidence

21  that was originally collected in this case.  His case,

22  by our standard, is not that old, though.  You know, a

23  lot of the cases I work on are from the 70s, 80s, 90s,

24  so his case by our standard is a newer case.

25      MR. KREVLIN:  Got it.

Interview

1    DET. WEINHART:  And the laws have changed now

2   and policies and procedures have changed.  And I know

3   specifically with Detroit PD, it's a lifetime retention

4   on any type of high-felony case.

5    MR. KREVLIN:  Yeah.

6    DET. WEINHART:  So, you know, it's kind of a

7   lesson learned of looking back at the old cases

8   realizing that evidence was destroyed that could be

9   tested today.  Even from 2013 to now, the DNA, it's a

10  whole different ball game.  It's the same testing with

11  new science and, you know, the new chemistry that they

12  use, so, you know, even some of the not so old cases

13  can be reviewed just based on the DNA alone.

14    MR. KREVLIN:  Are you -- so are you allowed

15  to share the results of the Molotov?

16    DET. WEINHART:  I am not, but I will tell you

17  this -- and I let other one of the other students know,

18  as well -- once the case is completely wrapped up, I

19  will definitely personally reach out to the people that

20  I talked to on this case and let you guys know what the

21  results are.

22    MR. KREVLIN:  Cool.  I mean, that was one

23  thing that we -- yeah, I'm happy that you were able to

24  get that, because we had trouble so that's a good sign,

25  I guess.

Interview

1      DET. WEINHART:  Well, the positive for me is

2  I'm retired from Detroit, so I have a lot of good

3  connections there.  So I pretty much went from Detroit

4  to the prosecutor's office, so I still am able to deal

5  with all of the same people that I dealt with when I

6  worked at Homicide.

7      MR. KREVLIN:  Got it.  Cool.

8      DET. WEINHART:  Yeah.  So anything else you

9  can think of that might be relevant or anything that

10  pops up or you find notes on, this is my cell or you

11  have my e-mail.  Feel free to do either, feel free to

12  contact me if anything comes up, but I appreciate you

13  taking the time to call me and kind of go over on what

14  you guys did on it.

15      MR. KREVLIN:  No problem.  I'm going to send

16  you later today or sometime this week, any memos I

17  have.  I'm just gonna send them your way --

18      DET. WEINHART:  Okay.

19      MR. KREVLIN:  -- even if it helps or not.

20  You can just take a look.

21      DET. WEINHART:  Right.

22      MR. KREVLIN:  And then I'll send any

23  recordings I have from interviews, as well.

24      DET. WEINHART:  Okay.  Perfect.  I appreciate

25  it.

**Interview**

1      MR. KREVLIN:  Yes.

2      DET. WEINHART:  Like I said, if you have any

3   questions or you think of anything, just feel free to

4   reach out to me.

5      MR. KREVLIN:  Okay.  Awesome.  Thank you.

6      DET. WEINHART:  All right.  Thank you so

7   much.  I appreciate it.

8      MR. KREVLIN:  Yeah.  Thanks, Detective.

9      DET. WEINHART:  All right.  Buh-bye.

10      MR. KREVLIN:  Take care.  Bye.

11      (End of recording.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF REPORTER

2

3  STATE OF MICHIGAN          )

4                    ) SS

5  COUNTY OF MACOMB          )

6

7

8            I HEREBY CERTIFY that I transcribed this

9  audio recording.  And that this is a full, true, complete and

10  correct transcription of said audio recording (to the best of

11  my ability to hear and understand said recording)

12            _____

13

14            Kathryn Duronio,

15            CSR - 15685

16            Notary Public,

17            Macomb County, Michigan

18  My Commission expires:  August 24, 2028

19

20

21

22

23

24

25

**Interview**

## 1

**100** 10:1

## 2

**20-plus** 23:5
**2013** 24:9
**24** 19:24
**25** 19:24
**25-plus** 21:3

## 7

**70s** 23:23

## 8

**80s** 23:23

## 9

**90s** 23:23

## A

**access** 13:1,3
**actors** 16:13
**Addicted** 6:25
**adjustment** 20:1,17
**administrative** 2:24
**affidavit** 14:4
**aftercare** 20:21
**age** 21:17 23:4
**Alicia** 13:20
**allowed** 24:14
**amount** 11:22
**anymore** 17:4
**apparently** 9:19

**apply** 2:8
**article** 2:12 9:6,13
**article's** 9:20
**Ashley** 13:20
**aspect** 20:7
**aspects** 2:10
**assigned** 3:2 4:20
**attorneys** 21:2
**authorities** 3:16
**average** 23:4
**Awesome** 26:5

## B

**back** 15:23 19:18 24:7
**background** 2:17
**ball** 24:10
**barriers** 19:21
**based** 4:22 8:22 9:12 18:8
  21:14 24:13
**belief** 22:5
**believed** 19:6
**bell** 14:14
**Benefit** 10:25
**bit** 7:20 11:12 13:15 14:20
**Brady** 22:9
**brother** 5:12
**Buh-bye** 26:9
**bunch** 3:5
**burned** 15:10
**business** 6:4
**Bye** 26:10

## C

**call** 22:19 25:13

**called** 15:23
**care** 26:10
**cared** 11:9
**case** 2:23 3:2,13 4:3,4 8:19
  9:22 14:1,2 17:22 18:4 21:8,
  13 22:3,5,22 23:12,21,24
  24:4,18,20
**cases** 2:7,10 21:12,17,19
  23:4,23 24:7,12
**Caulford** 5:15
**cell** 25:10
**cetera** 20:16
**challenging** 20:19
**chance** 19:19
**changed** 24:1,2
**character** 6:22
**check** 12:18,20
**chemistry** 24:11
**choice** 21:18
**circumstance** 22:1
**circumstances** 14:5
**class** 3:1 4:13
**close** 3:22
**clothing** 6:8 7:24
**cocktail** 16:20 23:12,19
**collected** 23:21
**combination** 7:1
**complete** 21:11,15
**completely** 24:18
**conclusion** 22:1
**conditions** 20:7
**conference** 22:4
**confirm** 18:13
**connections** 25:3
**contact** 4:18 5:22 11:23 12:4
  13:21,25 15:4 16:5 17:6 25:12

**Interview**

**contacting** 3:12

**continue** 10:10

**conversation** 6:14 15:15

**conversations** 12:11

**convicted** 18:6,10

**Conviction** 2:5

**convictions** 2:22

**Cool** 24:22 25:7

**Cooley** 2:6,9

**cooperative** 16:25 17:1,3

**corruption** 22:10

**coughed** 8:8

**counteract** 18:23

**County** 2:4

**cousin** 16:16

**coverage** 9:17

**crime** 9:8

**crux** 8:19

D

**deal** 25:4

**dealt** 25:5

**deceased** 21:20

**decision** 18:22

**defense** 21:3

**denied** 16:2

**departments** 21:22 23:6

**deserve** 22:7

**destroyed** 21:21 23:10 24:8

**DET** 2:3,16,25 3:9,18,20,24
4:1,8,11,14,16,21,25 5:3,6,8,
10,14,17,19,21,25 6:2,6,9,11,
16,20,23 7:4,7,10,13,19 8:5,9,
14,17,21,24 9:5,16,24 10:2,6,
16,19,25 11:3,7,13,21 12:3,5,
10,14,16,19,21,23 13:8,10,13,

16,18,24 14:8,12,15,17,19
15:3,12,20 16:1,4,11,14,17,
21,24 17:2,5,8,10,14,19,23
18:2,7,17,19 19:4,11,14,23
20:10,14,25 21:10,25 22:14,
18 23:2,13,16,20 24:1,6,16
25:1,8,18,21,24 26:2,6,9

**detective** 2:4 26:8

**detectives** 21:1

**deter** 17:25

**Detroit** 4:5,7,18 10:7 11:23
12:7 21:1 24:3 25:2,3

**diagnosis** 7:2,6

**difficult** 20:12

**directly** 17:6

**disagreed** 18:22

**discrepancy** 10:4

**discuss** 22:5

**divvied** 4:22 14:24

**DNA** 2:9 21:12,14 22:8 23:8
24:9,13

**doubt** 8:11 18:11

**drive** 13:3

**due** 21:17,18

**dump** 13:4

E

**e-mail** 25:11

**effort** 12:6 16:6

**encounter** 7:20

**end** 15:24 20:23 26:11

**enforcement** 22:10

**essence** 10:20

**evidence** 3:5,10 7:23 8:7,25
10:9 17:22 18:5,24 21:21
23:7,14,20 24:8

**exist** 21:23

**exoneration** 21:15 22:6,15

**exonerations** 19:25 21:14

**expand** 3:14

**experience** 21:3

**extremely** 19:20

F

**fact** 9:6 21:18

**fair** 11:22

**familiar** 9:12

**father** 19:3

**feel** 7:14 11:5 25:11 26:3

**felt** 10:23 11:5

**figure** 5:2 7:12

**files** 23:7

**financially** 20:19

**find** 14:11 16:24 19:1,2 25:10

**finding** 18:24

**fine** 6:12

**floods** 21:22

**follow** 10:13

**forgetting** 5:13 14:5

**forgiveness** 19:18

**forward** 10:9

**free** 21:9 25:11 26:3

**frustrating** 11:12

**fuck** 15:16

**function** 20:4

G

**game** 24:10

**genuine** 17:13

**genuinely** 19:12

**girlfriend** 5:12

**Interview**

**gist** 6:13

**give** 2:17

**giving** 19:19

**good** 2:3 5:8 19:3,13,15 20:12, 25 24:24 25:2

**gotcha** 3:20 7:4,19 10:6 12:10 14:12 15:13 16:4,14 17:10

**gotta** 7:25 8:1

**grant** 23:9

**granting** 22:21

**grants** 2:9

**group** 2:20,22 16:6 17:17

**guess** 6:12 13:4 18:22 19:1 24:25

**guy** 11:15 14:25 19:3,13,15

**guys** 4:17,18 6:14 9:10 10:7, 10 12:10,12 13:3 24:20 25:14

---
**H**
---

**happened** 18:1

**happening** 21:17

**happy** 24:23

**hard** 14:23 17:16 20:1

**head** 13:11

**helps** 25:19

**high** 9:22

**high-felony** 24:4

**holes** 3:23

**home** 8:1,3,4 15:9,10 16:19

**Homicide** 21:2 25:6

**honestly** 8:11 11:9,12 15:15

**hook** 11:6

**house** 6:3 7:23 8:25 10:8

**huge** 13:6

**hung** 15:17,18,22

---
**I**
---

**illness** 6:24

**impression** 10:19 17:10 18:3 19:2

**inaudible** 8:2 15:15 18:18 19:1

**incarcerated** 19:22 20:3

**incentive** 22:24 23:1,3

**incident** 9:18 16:20

**incidents** 21:22

**inclined** 17:17

**information** 11:15

**inhumane** 20:8

**initial** 3:21 12:8 18:3 19:2

**initially** 3:16 7:17 15:16 18:6, 14

**innocence** 2:6,8 20:21

**innocent** 18:25

**inside** 8:4 20:7,8

**insinuation** 16:3

**Integrity** 2:5

**interaction** 9:4

**interactions** 6:18

**interview** 12:8 15:2

**interviewed** 17:11

**interviews** 3:14 25:23

**investigation** 3:22 21:11

**investigative** 13:12

**involved** 3:13,15 15:8 16:3,13

**involvement** 2:18

---
**J**
---

**jail** 20:8

**Jamil** 5:1 14:25 15:4

**January** 4:24 5:22 14:24

---
**job** 19:17

**journalism** 3:12 17:16

**jury** 18:9,22

**Justice** 13:7

---
**K**
---

**Kenneth** 2:12 3:4 15:7 17:6,7, 18

**Kenneth's** 5:12 14:6 16:19 21:9

**kind** 2:23 3:14,22 4:20 8:1,19 10:12 15:1,16,23 16:2 21:25 22:7 24:6 25:13

**knew** 9:21

**knowing** 20:3

**knowledge** 9:8

**Koscho** 5:1 14:25 15:4

**KREVLIN** 2:15,19 3:1,10,19, 21,25 4:6,10,12,15,19,22 5:1, 4,7,9,11,16,18,20,24 6:1,5,7, 10,15,17,21 7:2,5,8,11,16,21 8:6,11,15,18,22 9:3,14,23,25 10:3,13,17,22 11:1,4,8,14 12:1,4,6,13,15,18,20,22 13:6, 9,11,14,17,23 14:3,9,13,16, 18,22 15:6,14,22 16:2,9,12, 15,18,22 17:1,3,7,9,12,15,20, 24 18:3,8,18,20 19:5,12,15 20:6,13,24 21:5,24 22:13,17, 23 23:11,15,18,25 24:5,14,22 25:7,15,19,22 26:1,5,8,10

---
**L**
---

**landlord** 15:13

**Lansing** 2:7

**Latoya** 5:15,16

**Latoya's** 16:16

**law** 22:10

**laws** 24:1

**Interview**

lead  14:3,10

leads  4:20

learned  24:7

leave  19:16

led  8:18

legitimately  20:18

lesson  24:7

letting  19:18

lies  19:10

lifetime  24:3

literally  15:18

lives  17:4

long  19:17

looked  3:11,16 15:14

lot  8:19 13:19 14:20 16:6,12
20:15 21:20 23:8,23 25:2

lots  19:21

loving  19:3

luck  20:12

**M**

made  4:6 10:7 18:22 19:1

Mahdi  16:15,18,22

main  6:13

make  5:22 22:19

makes  18:16

making  21:18

Mario  16:15,18,22

matter  7:21

Medill  2:13 13:7

meet  8:3 12:7

member  18:9 19:20

members  4:13

memo  9:4

memory  15:19

memos  25:16

mental  6:24 20:16,17

met  5:20 7:24 8:3 17:7

Michigan  17:4,9

minimal  12:4

misconduct  22:11

missing  21:21

Molotov  16:20 23:11,18 24:15

mom  14:6

monetary  20:16

moved  17:4

**N**

names  4:15 13:19

nature  8:16

newer  23:24

news  9:11,17,21

night  16:19

Nixon  2:12 3:2,4 17:6

Northwestern  2:14,20 13:12

notes  4:2 25:10

number  12:2

**O**

objective  17:21

office  2:4 22:20 25:4

operate  13:15

options  21:7,10

original  22:25

originally  4:4 23:21

overlooked  3:19

owned  15:8

owner  15:12

**P**

paid  7:18

paperwork  3:5,6

part  2:19,22 22:10

PD  4:5 21:2 24:3

people  2:8 3:13,15 4:3 13:21
14:25 16:7 17:16 19:22 20:2,
22 24:19 25:5

perceived  18:14

percent  10:1

Perfect  25:24

person  4:7 14:11 15:1

personally  18:5 20:2 24:19

phone  16:23

place  6:19,25 7:15

plate  14:21

point  9:19 10:12

points  11:15,16

police  18:13 23:7

policies  24:2

pops  25:10

position  21:9

positive  25:1

possibly  5:14

potential  2:8,21

potentially  11:15

present  22:2

presented  17:25

pretty  20:25 23:16 25:3

prior  9:11 11:23,25

prison  20:7

prisoners  20:15

problem  15:20,21 25:15

procedures  24:2

Interview

**process** 2:24

**producing** 10:11

**productive** 19:20

**profile** 9:22

**profited** 15:10

**program** 2:21

**programs** 13:12

**progress** 20:23

**project** 2:7,13 9:10,21 12:25 13:7 20:21

**property's** 23:10

**Prosecutor** 22:2,19

**prosecutor's** 2:4 22:20 25:4

**prosecutorial** 22:11

**prosecutors** 22:23,25

**provide** 20:19

**provided** 3:4

---

**Q**

**question** 6:13 21:5

**questions** 15:25 26:3

---

**R**

**rationale** 11:17

**reach** 12:24 15:4 24:19 26:4

**reached** 4:5 13:19 15:6

**reaching** 2:11 16:7

**read** 8:23 9:13

**reading** 3:3 9:6

**realizing** 24:8

**reason** 2:11 8:1 15:7

**reasonable** 18:11

**recall** 5:23 6:12,13 11:24

**receiving** 20:15

**record** 12:9,11

**recording** 26:11

**recordings** 25:23

**Reformatory** 17:9

**related** 4:4

**relationship** 14:7

**released** 20:22

**relevant** 14:1 25:9

**remain** 17:21

**remember** 4:1,9 6:2 9:1,5 13:24 14:10 15:5 16:5,25 17:6

**responding** 10:15,18

**results** 24:15,21

**retention** 23:6 24:3

**retest** 23:9

**retired** 21:1 25:2

**retried** 22:22

**retry** 21:18 22:18,24

**reviewed** 24:13

**ring** 14:13

---

**S**

**scenario** 21:8

**science** 24:11

**screwed** 22:25

**searching** 18:20

**selected** 2:22

**send** 25:15,17,22

**sense** 18:16

**settlements** 20:16

**share** 24:15

**shared** 13:3

**shifted** 13:14

**show** 17:17,18 18:25 22:24

**side** 3:12

**sign** 24:24

**situation** 19:7

**skirted** 8:2

**society** 19:17,19,20

**son** 5:18

**sound** 9:12

**specific** 4:2

**specifically** 2:6,9 4:23 5:21 21:12 24:3

**spoke** 5:12 9:9

**spoken** 11:24

**standard** 23:22,24

**standpoint** 11:4

**Stanley** 4:24 5:22 6:17 14:24

**started** 3:2 19:25 21:12

**stated** 9:7,18

**stopped** 10:14,17

**store** 6:3,5,8 7:25

**story** 7:14 9:18 19:6

**students** 2:20 24:17

**stuff** 8:7 16:10 21:23

**supervisors** 22:20

**surprise** 8:22

**Sydney** 13:20

**sympathy** 17:17,18

**systemically** 19:21

---

**T**

**taking** 25:13

**talk** 7:17 10:10,24 15:17

**talked** 4:2 7:22 13:1 24:20

**talking** 10:12

**talks** 9:6

**Interview**

6

team  21:1 22:2,4

terms  3:15,21 10:4 13:7 15:25
    19:18,21 21:8

terrible  19:17

test  21:23

tested  24:9

testing  24:10

thing  24:23

things  3:12 22:8

thought  4:16 15:8 17:12 18:4,
    8,15 19:12

throw  20:11

time  3:17 5:13 11:9 13:22
    18:13 21:6 25:13

times  11:24 12:2 19:7 23:8

today  24:9 25:16

told  8:24 9:11,20

totality  22:1,7

totally  21:7

touch  4:24

transactional  8:15

transcript  8:23

transcripts  3:3

trial  3:3 8:23 9:7,16 21:16
    22:7,16

trials  22:21

trip  4:6 10:7

trouble  24:24

trustworthy  6:22 7:12

turnover  13:7

type  10:9 22:9,11 24:4

typically  21:16 22:14

---

**U**

ultimate  22:3

umbrella  3:14

uncovered  3:8

understandable  9:2

understanding  17:25

unit  2:5 21:11

University  2:20

unsigned  14:4

untrustworthy  11:19

untruthful  11:8

upstairs  8:7

---

**V**

variables  22:12

viable  21:7

violations  22:9

---

**W**

walked  7:24

wanted  2:16

Wayne  2:4

ways  18:24

week  25:16

WEINHART  2:3,16,25 3:9,18,
    20,24 4:1,8,11,14,16,21,25
    5:3,6,8,10,14,17,19,21,25 6:2,
    6,9,11,16,20,23 7:4,7,10,13,
    19 8:5,9,14,17,21,24 9:5,16,
    24 10:2,6,16,19,25 11:3,7,13,
    21 12:3,5,10,14,16,19,21,23
    13:8,10,13,16,18,24 14:8,12,
    15,17,19 15:3,12,20 16:1,4,
    11,14,17,21,24 17:2,5,8,10,
    14,19,23 18:2,7,17,19 19:4,
    11,14,23 20:10,14,25 21:10,
    25 22:14,18 23:2,13,16,20
    24:1,6,16 25:1,8,18,21,24
    26:2,6,9

wise  8:25 17:10 23:3

---

witnesses  4:3 14:1 21:20

work  2:3,5,6,7,9 4:23 13:4
    14:24 18:13 20:23 21:4,19
    23:23

worked  9:10 13:25 25:6

working  20:21 23:8

works  20:20

world  20:5,11

Worthy  22:2,19

wrapped  24:18

written  2:13 9:20

wrongful  2:21

wrote  9:4

---

**Y**

years  19:25 21:3 23:5

young  20:3