USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/19/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| IN RE SUBPOENA TO SAM KREVLIN |
|---|

25-MC-00376 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Sam Krevlin ("Krevlin" or "Movant") moves to quash a subpoena served on him by certain defendants (the "Individual Defendants" or "Respondents") in a civil action currently proceeding in the United States District Court for the Eastern District of Michigan (the "Underlying Action"). Respondents seek information related to Krevlin's past work as a journalism student. Krevlin asserts the journalist's privilege. For the reasons that follow, Krevlin's motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.   KREVLIN AND THE MEDILL JUSTICE PROJECT

Krevlin is a New York resident who attended the Medill School of Journalism at Northwestern University ("Medill") from 2015 to 2019. Dkt. No. 5 ¶¶ 1–2. At Medill, Krevlin participated in a journalism course called the Medill Justice Project (the "Project"). *Id.* ¶ 2. As part of their assigned work in the course, Krevlin and other students on the Project investigated the case of Kenneth Nixon, an incarcerated individual who was convicted of killing two children in the 2005 firebombing of a Detroit home. *Id.* In October of 2018, the *Detroit Free Press* published an article by Krevlin and other Medill students regarding the findings of their investigation, which cast doubt on the reliability of Nixon's conviction. *See id.* ¶ 3; Dkt. No. 12-2. Following the publication of the *Free Press* article, the Wayne County, Michigan, Conviction Integrity Unit (the "CIU") opened a re-investigation into Nixon's case. Dkt. No. 12 at 2; Dkt. No. 13 at 5. Based on the CIU's investigation, the Wayne County Prosecutor determined that he

1

could not stand behind Nixon's conviction, and in 2021, on the recommendation of the Wayne County Prosecutor, the Third Judicial Circuit Court of Michigan entered a stipulated order vacating the conviction and dismissing the criminal case against Nixon. *See* Dkt. No. 12 at 3; Dkt. No. 12-7 at 3.

## II.    THE UNDERLYING ACTION AND THE INFORMATION AT ISSUE

Nixon subsequently filed the Underlying Action in the Eastern District of Michigan, bringing federal and state claims against the City of Detroit and certain officers of the Detroit Police Department related to the alleged fabrication of inculpatory evidence and withholding of exculpatory evidence during Nixon's prosecution and trial. *See* Dkt. No. 12 at 3–4; Dkt. No. 12-8. For their defense, the Individual Defendants seek information related to Krevlin's work on the Project. Principally, they are interested in any information Krevlin may possess related to two key pieces of trial testimony that identified Nixon as the perpetrator of the 2005 firebombing incident, both of which were later called into doubt by the Medill students' reporting: the testimony of trial witness Stanley January (and how that testimony was obtained), and the testimony of trial witness Brandon Vaughn (and, perhaps more importantly for present purposes, the contemporaneous views of investigators and prosecutors of that testimony).

### A. Stanley January and the Alleged Agreement to Falsify Testimony

Stanley January was a jailhouse informant who testified at Nixon's trial that Nixon had confessed the firebombing to him while they were cellmates. In the Underlying Action, Nixon alleges that Detective Moises Jimenez of the Detroit Police Department fed fabricated information to January and offered to reduce his sentence in an unrelated case in exchange for false testimony. Dkt. No. 12-8 ¶¶ 53–57. Given the importance of January to the present subpoena, a close review of January's various statements since Nixon's trial is warranted.

The *Free Press* article stated that January had "said in a recent interview . . . that he harbors doubts about Nixon's guilt, though he stands by his trial testimony." Dkt. 12-2 at 101. The article noted that on cross-examination at trial, January had been asked by Nixon's defense lawyer whether he had seen television coverage of the fire before meeting Nixon, and he said that he had not. *See id.* at 105. mThe article also highlighted that January had said in his trial testimony that he was not testifying in exchange for leniency. *See id.* The article then stated that in "multiple interviews" with the Project, January had stated he was perplexed by Nixon's demeanor in jail and had doubts about his guilt, but he stood by his trial testimony that Nixon had discussed the case with him in jail. *See id.* The article also represented that January had said in these interviews that, contrary to his trial testimony, he *had* seen television news coverage of the fire before meeting Nixon in jail. *See id.*

During its review of Nixon's case following the *Free Press* article, the CIU spoke to Krevlin about January. *See* Dkt. No. 12-5. In a recorded 2020 phone conversation, Krevlin told a CIU detective that he interviewed January outside a clothing store in Detroit in 2018. Krevlin also shared his overall impressions of January as not trustworthy, transactional, and someone who would only provide information if he thought he would benefit from doing so. *See id.* at 6–8. Krevlin could not recall many specifics of what January had said to him, but he did recall going to January's house with him and waiting outside because January had represented that he possessed some materials relevant to Nixon's case (which he never provided to Krevlin). *See id.* at 8. Krevlin stated that he thought more than one interview of January had been conducted, that at least one may have been off the record, and that some of their conversations would have been recorded. *See id.* at 12. He agreed with the CIU detective that the underlying materials from the Project's investigation would likely be held at Medill. *See id.* at 12–13. He said he was willing

3

to provide his memos, notes, or recordings related to Nixon to the CIU, although such materials were never provided. *See id.* at 25.

On February 16, 2021, the CIU submitted a letter to Judge Bruce Morrow of the Third Judicial Circuit Court of Michigan, recommending Nixon's conviction be vacated. Among numerous other issues unrelated to January, the letter stated that the CIU had learned that January knew of the firebombing through television coverage prior to meeting Nixon, and his failure to affirmatively testify to that fact meant that he could not be impeached on that prior knowledge. *See* Dkt. No. 12-7 at 2. According to the letter, this "new information," along with the undisclosed incentives January received for testifying, "call[ed] into question the reliability of the identification in this case." *Id.* at 3.[1]

On March 7, 2022, after Nixon's conviction had already been vacated but before Nixon commenced the Underlying Action, January recanted his trial testimony in a sworn affidavit. *See* Dkt. No. 12-6. In that affidavit, January stated that Nixon had never confessed the firebombing to him, nor had he ever heard Nixon say he was responsible for the fire. He stated that Detective Jimenez visited him in jail, told him that he needed help with a case, and told January what he wanted him to say. January averred that, prior to this conversation with Jimenez, he did not know "any details" of the firebombing because Nixon had never said anything to him about it. He swore that Jimenez fed him facts about the firebombing, which he wrote down and memorized, and that anything he had said about Nixon's involvement was false. He further stated that, in exchange for this testimony, Jimenez had promised him that he would reduce his jail time so that January could attend his daughter's graduation. *See id.*

---

[1] The letter to Judge Morrow indicates that CIU learned this information through their investigation; the memo does not reference Krevlin or the *Free Press* article, nor provide any other details about what investigative steps were taken.

4

On June 28, 2023, Nixon filed his Complaint in the Underlying Action. The allegations in the Complaint related to January state that Detective Jimenez had approached a prior informant (January) and stated he needed help with a new case, that Jimenez fed January information and told him what to say, that he made January promises in exchange for his testimony, and, finally, that those promises were not disclosed to the prosecution or to the defense at the time of Nixon's trial. *See* Dkt. No. 12-8 ¶¶ 49–57. The Complaint does not reference January's statements about news coverage of the fire.

January sat for a deposition in the Underlying Action on August 29, 2025. *See* Dkt. No. 12–14. In the excerpts from the deposition provided to the Court, January stated that he had left Detroit in February or March of 2018, that he did not know Krevlin or recall being interviewed by him about Nixon's case, and that he also had not been interviewed by anyone from CIU about Nixon's case. *Id.* at 153:17–156:7.

### B. Brandon Vaughn and the Staples Memo

Brandon Vaughn testified at Nixon's trial as a purported eyewitness; he was thirteen years old at the time of the trial. In the Underlying Action, Nixon alleges that Vaughn made inconsistent statements to the police, repeatedly revising his account of the incident to incorporate the information that detectives divulged to him. *See* Dkt. No. 12-8 ¶¶ 28–33. Further, Nixon alleges that a detective named Kurtiss Staples expressed doubts about Vaughn's credibility in a pre-trial memo to his lieutenant, James Tolbert (the "Staples Memo"). *Id.* ¶¶ 18, 35. Through FOIA, Medill acquired an unredacted copy of the Staples Memo during its investigation. *See* Dkt. No. 12-2 at 105. The CIU's February 16, 2021 letter to Judge Morrow cites the Staples Memo and notes that it was never disclosed to the defense. *See* Dkt. No. 12-7 at 2.

## III. PROCEDURAL HISTORY

On March 7, 2025, the Individual Defendants subpoenaed Krevlin for documents related to the Nixon case, requesting his entire investigative file. Dkt. No. 6 ¶ 2. Krevlin objected to the subpoena based on improper service, improper production requirements, and the journalist's privilege. *Id.* ¶ 4. Several meet-and-confers followed, and the parties failed to reach an agreement on the production of documents. *Id.* ¶ 5. On August 5, 2025, the Individual Defendants subpoenaed Krevlin again, this time omitting document requests and instead requesting that Krevlin appear for a deposition. *Id.* ¶ 6. Krevlin objected to the second subpoena on August 18, 2025, again asserting the journalist's privilege. *Id.* ¶ 9.

Krevlin refused to appear for a deposition and moved this Court to quash the second subpoena on September 3, 2025. Dkt. No. 1. Respondents filed an opposition on September 17, 2025, in which they requested an order from this Court compelling Krevlin to comply with the first and second subpoenas. Dkt. No. 12.

## DISCUSSION

### I. THE JOURNALIST'S PRIVILEGE

The Second Circuit "has long recognized the existence of a qualified privilege for journalistic information" rooted in federal common law.[2] *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 32 (2d Cir. 1999).[3] The State of New York also recognizes the journalist's privilege under

---

[2] While some courts have suggested that the federal journalist's privilege is also rooted in the First Amendment, the Second Circuit has explicitly declined to address the issue. *See Gonzales*, 194 F.3d at n.6. A constitutional basis for the federal privilege would be relevant in determining whether the privilege remains independently operative in cases where a federal court must apply state privilege law. However, the Court need not decide the issue because, as explained herein, federal privilege law applies to this case regardless.

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

the New York Shield Law. N.Y. Civ. Rights Law § 79–h. "The underlying policies served by the New York Shield Law and federal law are congruent." *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987). "Both 'reflect a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment.'" *Id.* (quoting *Baker v. F & F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972)). In application, however, the "protections supplied by the New York reporter's shield are inclusive of and broader than those supplied by the federal privilege." *Fowler v. Vary*, No. 20-CV-09586 (LAK), 2022 WL 3211638, at *7 (S.D.N.Y. Aug. 9, 2022).

### A. Federal Law Applies

Krevlin asserts privilege under both federal and state law, but only the federal law of privilege applies to this case. Federal Rule of Evidence 501 provides that privilege claims in federal court are governed by federal common law unless the U.S. Constitution, a federal statute, or a rule of the U.S. Supreme Court provides otherwise, except that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. Plaintiff in the underlying action brings claims under 42 U.S.C. § 1983 and state law. *See* Dkt. No. 12-8. Where, as here, "a plaintiff brings both federal and state law claims and the evidence at issue is relevant to all claims, 'courts consistently have held that the asserted privileges are governed by the principles of federal law.'" *C.R. Corps v. Pestana*, No. 21-CV-09128 (VM), 2022 WL 1422852, at *8 (S.D.N.Y. May 5, 2022) (quoting *von Bulow*, 811 F.2d at 141). Therefore, the federal reporter's privilege, not New York's Shield Law, governs the instant motion. *See Sines v. Yiannopoulos*, No. 20-MC-00241 (KPF), 2020 WL 6058279, at *4 (S.D.N.Y. Oct. 14, 2020). The Court may nevertheless consider the policy considerations underlying the relevant state's law, but doing so here will not change the Court's analysis

7

because the underlying state and federal policy considerations are congruent. *Id.* Thus, the Court will proceed under the framework provided by the Second Circuit for determining the applicability of the federal journalist's privilege.

### B. Krevlin Properly Invokes the Journalist's Privilege

"In order to establish that the journalist's privilege applies in the Second Circuit, [Movant] must establish that (i) he was acting in 'the role of the independent press,' (ii) 'at the time the gathering of information commences.'" *Id.* at *5 (quoting *Chevron Corp. v. Berlinger*, 629 F.3d 297, 307 (2d Cir. 2011)). That is, "[t]he journalist's privilege is properly invoked 'where the purpose to disseminate the information motivated the gathering of the information,' and is not properly invoked 'where the information was gathered for other reasons and the intent to publish arose only later.'" *Williams v. NBC Universal Media LLC*, No. 25-MC-00122 (LJL), 2025 WL 2437381, at *6 (S.D.N.Y. Aug. 25, 2025) (quoting *Chevron*, 629 F.3d at 307). "The privilege may be invoked by an individual 'involved in activities traditionally associated with the gathering and dissemination of news, even though he may not ordinarily be a member of the institutionalized press.'" *Breaking Media, Inc. v. Jowers*, No. 21-MC-00194 (KPF), 2021 WL 1299108, at *3 (S.D.N.Y. Apr. 7, 2021) (quoting *von Bulow*, 811 F.2d at 142).

Krevlin has properly invoked the journalist's privilege here. Although he was not a professional journalist at the time he gathered the information at issue, in the sense of doing so for pay, he unquestionably was undertaking activities traditionally associated with the gathering and dissemination of news. The Project was, after all, a journalism class, in one of the premier journalism schools in the country, composed of journalism students, taught by journalism professors, and the objective was to investigate a case with the goal of publishing the results of that investigation in a newspaper or similar outlet for professional journalism. Dkt. No. 5 ¶¶ 2–3. Moreover, Krevlin was acting in the role of the independent press. Even if Nixon had

solicited the Project to investigate his case, Medill's professional journalistic focus and editorial independence establish that the intent to disseminate existed from the inception of the Project's investigation and that the Project's reporting was not "subservient to the objectives of others who have a stake in what will be published." *Chevron Corp.*, 629 F.3d at 309 (noting that "a journalist who has been solicited to investigate an issue and presents the story supporting the point of view of the entity that solicited her . . . can establish entitlement to the privilege by establishing the independence of her journalistic process").

### C. Respondents Overcome the Privilege as to Only a Limited Set of Information

Once established, the federal journalist's privilege is qualified. *Gonzales*, 194 F.3d at 35–36. A party seeking the protected material may overcome the privilege, and the weight of its burden depends on whether the material "was acquired by the journalist through a promise of confidentiality." *Chevron*, 629 F.3d at 307. "For non-confidential materials, the litigant seeking to overcome the privilege must show only that the information is 'of likely relevance to a significant issue in the case, and [is] not reasonably obtainable from other available sources.'" *United States v. Whitehead*, No. 22-CR-00692 (LGS), 2024 WL 912039, at *1 (S.D.N.Y. Mar. 4, 2024) (quoting *United States v. Treacy*, 639 F.3d 32, 42 (2d Cir. 2011)). In contrast, "[f]or confidential information, the litigant must make a 'clear and specific showing' that the information is '(1) highly material and relevant, (2) necessary or critical to the maintenance of the claim, and (3) not obtainable from other available sources.'" *Id.* (quoting *Gonzales*, 194 F.3d at 33).

"It is the journalist's burden to demonstrate that the material he or she seeks to protect from disclosure is confidential." *In re Application of Chevron Corp.*, 709 F. Supp. 2d 283, 294 (S.D.N.Y. 2010), *as corrected* (May 10, 2010), *aff'd sub nom. Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011). Here, Krevlin has offered nothing to suggest that he obtained any

9

information under a promise of confidentiality. Although Krevlin's CIU interview contains a passing reference to the possibility of an off-the-record preliminary interview of January, the motion to quash does not appear to rely on that assertion. Because Krevlin does not meet his burden, the showing required for overcoming the privilege is the less onerous burden for non-confidential materials. Thus, Respondents need only "show that the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d at 36.

The "standard for relevance to overcome the journalist privilege for non-confidential materials is low." *Sokolow v. Palestine Liberation Org.*, No. 04-CV-00397, 2012 WL 3871380, at *3 (S.D.N.Y. Sept. 6, 2012). Nevertheless, "a litigant seeking nonconfidential materials will not be granted unfettered access" to a reporter's files. *Sikelianos v. City of New York*, No. 05-CV-07673, 2008 WL 2465120, at *1 (S.D.N.Y. June 18, 2008). Furthermore, generalized arguments that the material pertains to the subject of the underlying action cannot overcome the privilege, as the purpose of protection is "to allow the press to publish freely on topics of public interest without harassment and scrutiny by litigants seeking to conduct 'fishing expeditions' into nonbroadcast materials in the hope that some relevant information may turn up." *Williams*, 2025 WL 2437381, at *7 (quoting *Pugh v. Avis Rent A Car Sys., Inc.*, 1997 WL 669876, at *5 (S.D.N.Y. Oct. 28, 1997)). Additionally, "[t]he relevancy requirement is not met if the information sought in the subpoena is merely duplicative or serving a 'solely cumulative purpose.'" *Schoolcraft v. City of New York*, No. 10-CV-06005 (RWS), 2014 WL 1621480, at *3 (S.D.N.Y. Apr. 22, 2014) (quoting *United States v. Burke*, 700 F.2d 70, 76 (2d Cir.1983)).

To the extent Respondents seek comprehensive information from Krevlin on the mere basis that the Project relates to the Underlying Action, they have failed to show likely relevance

10

to a significant issue in the case. Aside from information regarding Krevlin's interview of January, Respondents do not even attempt to explain the relevance of the requested information, let alone identify the "significant issue in the case" that such information would implicate. Moreover, as to any information related to the Staples Memo, Respondents have failed to show that Krevlin is the only available source.

Respondents make a stronger showing with respect to information surrounding Krevlin's interview of January. Since January's trial testimony, subsequent recantation, and various conflicting statements in between those two events are central to Nixon's claims that the Individual Defendants conspired to advance false testimony at Nixon's trial, the veracity of January's various statements and his overall credibility affect a significant issue in the Underlying Action. Inconsistent statements that January made to Krevlin could be used to impeach January. However, this showing does not overcome the privilege because Respondents already possess January's inconsistent statements, and any additional information from Krevlin, if not wholly speculative, would be duplicative or cumulative.

Taking a step further, Respondents suggest that the requested information is relevant insofar as it goes to *Krevlin*'s credibility. Citing January's deposition testimony that he never spoke to Krevlin, Respondents posit that Krevlin may have fabricated the interview. *See* Dkt. No. 12 at 11. They call into question the truthfulness of Krevlin's reporting in the *Free Press* article and his statements to the CIU detective, which they assert "directly led to the CIU setting aside the conviction at issue in this case." *See id*. But they fail to specifically show how Krevlin's credibility will be relevant to a significant issue in the Underlying Action. Whether the CIU was justified in seeking to vacate Nixon's conviction is not itself an issue in the case. The issue is whether a Detective in the Detroit Police Department coerced or induced January to give

11

false testimony at Nixon's trial. The CIU made no such conclusion, and Respondents have presented nothing to suggest that Krevlin ever reported such a fact. Indeed, Krevlin's reporting reflects January saying he *stands by his trial testimony*. See Dkt. 12-2 at 101. The evidence for Nixon's falsification theory is instead the fact that January later recanted his trial testimony and stated that a detective induced him to lie. See Dkt. No. 6 at 9. Thus, January's prior statements to Krevlin are relevant *only* to the credibility of January's statements, and only in a scenario where the Individual Defendants attempt to impeach January with prior inconsistent statements that he made to Krevlin, and January responds that he never made such statements.[4]

Accordingly, the need for Krevlin's testimony in the Underlying Action is severely limited. Respondents have established potential entitlement only to information which tends to show whether the 2018 interview between Krevlin and January actually took place, the veracity of the *Free Press* article as it relates to January's statements in interviews with Krevlin, and, somewhat more tangentially, the veracity of Krevlin's statements about January to the CIU detective.

Of course, Respondents could argue that all of Krevlin's Medill-related information falls within those categories because, for example, contemporaneous notes and analysis of a conversation with January would naturally tend to show that the interview occurred. But requiring such broad disclosures would fly in the face of the privilege's overriding purpose,

---

[4] Respondents attempt to argue that the portion of January's 2022 affidavit where he says he did not know "any details" about the firebombing because Nixon never spoke to him about it, is inconsistent with his statements as reflected in the *Free Press* article that he had viewed news coverage, and also that his claimed viewing of news coverage necessarily means that Detective Jimenez did not feed him information. See Dkt. No. 12 at 10–11. These arguments are weak, as all three things could be true (January didn't know details and didn't learn them from Nixon, January was generally aware of the firebombing from news coverage on television, and January learned the details in his trial testimony only from being fed them by Detective Jimenez). The more relevant inconsistency is January's statements in the *Free Press* that he stands by his trial testimony, contrasted with his total recantation in his 2022 affidavit.

which strongly counsels against granting litigants unfettered access to a reporter's materials based on their limited pertinence to the case. In addition, Respondents have failed to establish that these materials, even if they were entitled to them, are not readily available from another source, as it is plain that Medill is the custodian of all records related to the Project.[5]

### D. Krevlin Has Waived Protection Over Only the Specific Information He Previously Disclosed

The Court rejects Respondents' suggestion that Krevlin's conversation with the CIU detective constituted a general waiver of the journalist's privilege. Dissemination of information is the definitive role of the journalist, and the public's interest in that role is the foundation of the journalist's privilege. *See Chevron Corp.*, 629 F.3d 297 at 307. The purpose of the privilege is for journalists to disclose their findings without fear that doing so will result in "wholesale exposure of press files to litigant scrutiny," which "would burden the press with heavy costs of subpoena compliance, and could otherwise impair its ability to perform its duties." *Gonzales*, 194 F.3d at 35. It is true that Krevlin's conversation with the CIU detective represents a different sort of disclosure than a press publication, but given the principles underlying the privilege, it cannot be true that any partial or limited disclosure of specific information results in wholesale subject matter waiver. Respondents' position would produce an absurd result where the prerequisite for invoking the privilege simultaneously invalidates it. Therefore, in the context of the federal journalist's privilege, selective disclosure must result only in selective waiver. Krevlin has waived the journalist's privilege only as to the facts directly disclosed to the CIU detective, which are confined to the transcript of the conversation. *See* Dkt. No. 12-5.

---

[5] This is doubly true with regard to the request for information about how the Project obtained the unredacted Staples Memo, when such information can be obtained from Medill or from the FOIA records at the Detroit Police Department.

For similar reasons, the Court also rejects Respondents' argument that waiver resulted from Krevlin's failure to produce a privilege log when he generally objected to the entire subpoena. To hold otherwise would allow litigants to indiscriminately compel journalists to produce catalogs of their entire investigative files, placing on the press exactly the sort of burden that the journalist's privilege is designed to avoid.

## II.    ATTORNEYS' FEES

Krevlin seeks reasonable attorneys' fees and expenses incurred in responding to the subpoena pursuant to Rule 45(d)(1). The request is denied. Under Rule 45(d)(1), when a party issues a subpoena without taking "reasonable steps to avoid imposing undue burden or expense" on a third party, the issuing court "must . . . impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees"—on the party or attorney responsible for the failure to do so. Fed. R. Civ. P. 45(d)(1). "Before imposing sanctions under Rule 45(d)(1), a court must conduct a two-part inquiry to determine: (1) whether the challenged subpoena imposed an undue burden or expense on the person(s) subject thereto; and (2) if so, what, if any, 'reasonable steps' the subpoenaing party and its counsel took to avoid imposing such a burden." *Data Collective II, L.P. v. Baron Cap. Mgmt. Inc.*, No. 25-MC-00057 (JAV), 2025 WL 1380122, at *3 (S.D.N.Y. May 13, 2025) (quoting *Saint-Jean v. Emigrant Mortg. Co.*, No. 11-CV-02122 (SJ), 2015 WL 13735434, at *3 (E.D.N.Y. Oct. 7, 2015)). Here, the circumstances do not warrant sanctions.

Krevlin suggests that the same reasons supporting his motion to quash also compel an award of attorney's fees. *See* Dkt. No. 7 at 16–17. Indeed, in the two-part inquiry for imposing sanctions under Rule 45(d)(1), "courts have recognized that the 'undue burden' analysis is tied to the relevance of the material sought and is directly related to the court's decision to quash a

14

subpoena for imposing an undue burden." *Breaking Media, Inc.*, 2021 WL 1299108, at *7 (S.D.N.Y. Apr. 7, 2021)). However, Krevlin overlooks that the basis for his motion to quash—and the basis for this Court's partial granting of that motion—is privilege, not undue burden.[6] He argues that "[u]nder the first prong, the materials sought are not relevant to any significant issue in the Underlying Action, and the Individual Defendants have failed to overcome the reporters' privilege." Dkt. No. 7 at 17. But that argument does not support a finding of undue burden; it merely reiterates the issues relevant to the privilege inquiry. Undue burden is a separate inquiry requiring the Court to "weigh 'the burden to the subpoenaed party against the value of the information to the serving party' by considering factors such as 'relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'" *MG Freesites Ltd. v. Scorpcast, LLC*, No. 22-MC-00361 (PAE), 2023 WL 2822272, at *2 (S.D.N.Y. Apr. 7, 2023) (quoting *Bridgeport Music Inc. v. UMG Recordings, Inc.*, No. 05-CV-06430 (VM) (JCF), 2007 WL 4410405, at *2 (S.D.N.Y. Dec. 17, 2007)). Krevlin has not directly addressed those factors, and the Court does not find undue burden in any event. Moreover, Respondents offered reasonable proposals to lessen any burden of compliance, and their opposition to Krevlin's assertion of privilege was justifiable (and successful in part). Accordingly, the Court will not award attorney's fees for the work required for objecting to the subpoenas, including litigation of the instant motion.

---

[6] Rule 45(d)(3) provides that a Court may quash a subpoena that "fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c); (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; **or** (iv) subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3) (emphasis added).

The Court's decision on attorneys' fees is without prejudice to any future motion by Krevlin to shift the costs of complying with the subpoena. *See Doe 1 v. Deutsche Bank Aktiengesellschaft*, No. 22-CV-10018 (JSR), 2023 WL 8113403, at *2 (S.D.N.Y. Nov. 22, 2023) ("A party issuing a subpoena is not necessarily required to bear the subpoenaed nonparty's cost of compliance, but can be required to bear some or all of the expenses where the equities of the particular case demand it." (quoting *In re World Trade Ctr. Disaster Site Litig.*, 2010 WL 3582921, at *1 (S.D.N.Y. Sept. 14, 2010))). The Court therefore encourages counsel to consider the most efficient and cost-effective means of securing Krevlin's compliance with the portion of the deposition subpoena that is not quashed.

## CONCLUSION

Accordingly, Krevlin's motion to quash is DENIED IN PART and GRANTED IN PART. In sum, the first subpoena (for documents), to the extent it was even facially valid, is quashed in its entirety. The second subpoena (for testimony), is quashed in part, namely: Respondents may depose Krevlin **only** to obtain (1) the logistics of the interviews he conducted with January as part of the Project (*i.e.* when, where, with whom, how long), but not the content; (2) a statement under oath that, as far as Krevlin is aware, the statements in the *Free Press* article about what January said in interviews were truthful and accurate; and (3) a statement under oath that, as far as Krevlin is aware, his statements to the CIU detective in the recorded interview were truthful and accurate. Given the very limited scope of the permissible questions, counsel should confer as to whether a sworn affidavit may substitute for deposition.

The Clerk of Court is respectfully directed to terminate Dkt. Nos. 1, 4, 9, 15.

Dated: November 19, 2025
      New York, New York

SO ORDERED.

_____
MARGARET M. GARNETT
United States District Judge